AF Approval TLK for SCN                Chief Approval MPF

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                CASE NO. 6:25-cr-321-PGB-NWH

ELENA FALZONE
a/k/a "Pogo", a/k/a "Pogo Glizzy"

**PLEA AGREEMENT**

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, Elena Falzone, and the attorney for the defendant, Mark Reyes, mutually agree as follows:

## A. Particularized Terms

### 1. Counts Pleading To

The defendant shall enter a plea of guilty to Counts One and Fourteen of the Indictment. Count One charges the defendant with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). Count Fourteen charges the defendant with distribution of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

2. Minimum and Maximum Penalties

Count One is punishable by a mandatory minimum term of imprisonment of 5 years up to 40 years, a fine of $5,000,000, a term of supervised release of at least 4 years and up to life, and a special assessment of $100.

Count Fourteen is punishable by up to 20 years of imprisonment, a term of supervised release of 3 years and up to life, a fine of up to $1,000,000, and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3. *Alleyne v. United States and Apprendi v. New Jersey*

Under *Alleyne v. United States*, 570 U.S. 99 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the defendant is subject to a mandatory minimum sentence of 5 years' imprisonment and a maximum sentence of life as to Count One because the following facts have been admitted by the defendant and are established by this plea of guilty: the conspiracy involved at least 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance.

4. Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

> First: two or more people in some way agreed to try to accomplish a shared and unlawful plan, the object of which was to possess with the intent to distribute, and to distribute, controlled substances; and
>
> Second: the Defendant knew the unlawful purpose of the plan and willfully joined in it.

The elements of Count Fourteen are:

> First: the defendant knowingly distributed a controlled substance, specifically, fentanyl; and
>
> Second: the defendant knew the substance she distributed was fentanyl or a controlled substance

5. Counts Dismissed

At the time of sentencing, the remaining counts against the defendant, Counts Thirteen, Sixteen, Seventeen, and Twenty-Four will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

6. No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the

United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

7. Discretionary Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to N.P.'s estate.

8. Chapter Two Offense Level - Joint Recommendation

Pursuant to the Fed. R. Crim. P. 11(c)(1)(B), and USSG § 2D1.1(a)(2)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's Chapter Two base offense level be calculated at 38. The parties agree, and the Factual Basis establishes, that the fentanyl distributed by the defendant to N.P. resulted in and was the "but-for" cause of N.P.'s death. As a result, the plea agreement establishes a more serious offense than the offense of conviction. Pursuant to USSG § 1B1.2(a), the parties agree that the Court should apply the guidelines applicable to the more serious offense, rather than the offense charged in the Indictment. The parties understand that such a joint recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

9. Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

10. Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. § 853, whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to,

the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B. Standard Terms and Conditions**

1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

2. Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to

make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that her financial statement and disclosures will be complete, accurate and truthful and will include all assets in which she has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to

the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6. Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make

with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7. Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8. Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this

office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront

and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11. Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12. Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 13th day of April, 2026.

GREGORY W. KEHOE
United States Attorney

Elena Falzone
Defendant

Rachel S. Lyons
Assistant United States Attorney

Mark Reyes
Attorney for Defendant

Michael P. Felicetta
Assistant United States Attorney
Chief, Orlando Division

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

CASE NO. 6:25-cr-321-PGB-NWH

v.

ELENA FALZONE
a/k/a "Pogo", a/k/a "Pogo Glizzy"

PERSONALIZATION OF ELEMENTS

As to Count One, between on or about August 30, 2022, and on or about May 1, 2024:

First: Did you and one or more people in some way agree to try to accomplish a shared and unlawful plan, the object of which was to possess with the intent to distribute, and to distribute, controlled substances?

Second: Did you know the unlawful purpose of the plan and willfully join in it?

As to Count Fourteen, on or about September 15, 2023:

First: Did you knowingly distribute a controlled substance, specifically, fentanyl?

Second: Did you know the substance you distributed was fentanyl or a controlled substance?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 6:26-cr-321-PGB-NWH

ELENA FALZONE
a/k/a "Pogo", a/k/a "Pogo Glizzy"

## FACTUAL BASIS

Since December of 2022, the Drug Enforcement Administration, Orange County Sherriff's Office, Orlando Police Department, and/or the Bureau of Alcohol, Tobacco, Firearms and Explosives, have been investigating the criminal activities of the RMS/EBK gang. "RMS/EBK" stands for "respect, money, structure/everybody killer". RMS/EBK members and their associates conspired to distribute controlled substances, and did distribute controlled substances, including methamphetamine and fentanyl, within the Middle District of Florida and elsewhere, among other criminal acts. The gang often disguised the true nature of these substances, marketing them as substances like Xanax, Percocet, or Adderall. In particular, RMS/EBK sold blue, circular fentanyl pills with an "M" and the number "30", mimicking prescription Percocet pills, and orange circular methamphetamine pills, mimicking prescription Adderall pills. The investigation was named "Operation Dirty 30s".

The investigation began when an overdose death exposed the gang and its criminal enterprise. Investigators believe at least five fatal fentanyl overdoses resulted from the organization's criminal conduct. Some of the individuals involved were also armed and sold firearms to their drug customers. Throughout the investigation, law enforcement seized numerous drugs and guns during undercover deals or traffic stops, conducted five residential searches, and seized the cell phones of numerous defendants.

<u>Summary of the Role of Each Defendant</u>




RMS/EBK has six documented members and five documented associates. The gang used "flags," or bandanas, to denote gang status and rank. Black flags signify higher-ranking members and the lower-ranking members, also known as soldiers, utilize white flags. RMS/EBK members wear black and white and display gang affiliation by wearing flags (bandanas),

clothing styles, and using emojis. The group uses a hand signal and will often replace an "E" with the number "3" and an "S" with the number "5" in correspondence.

Christian Roux-Rey ("Roux-Rey") was the leader of the drug trafficking organization and supplied large quantities of controlled substances to other members of the conspiracy. At some point or another, Roux-Rey was the supplier of each of the RMS/EBK members, either directly or through his managers. Roux-Rey set the prices and amounts of drugs. He obtained these substances from a source of supply located in California, often receiving packages in the mail. Throughout the conspiracy, Roux-Rey stored controlled substances and firearms in his residence, which he shared with Rebecca Murray ("Murray"). Roux-Rey distributed controlled substances to an undercover detective. During the investigation, the house Murray and Roux-Rey share was searched, where law enforcement identified additional controlled substances and multiple firearms. Law enforcement purchased or seized approximately 899 grams of methamphetamine[1] and 401 grams of fentanyl from Roux-Rey and Murray's residence.

Murray assisted Roux-Rey with storing controlled substances, including fentanyl and methamphetamine, in their shared residence. She would also

[1] Drug weights refer to a mixture and substance containing a detectable amount of a controlled substance unless otherwise specified.

weigh, package, and transport specified quantities of controlled substances at the direction of Roux-Rey. Murray would help hide the drugs when Roux-Rey was concerned by threats of law enforcement intervention.

Jeremiah Maldonado ("Maldonado") was a senior-ranking member of RMS/EBK, also known as a "black flag" and directed lower ranking members. He distributed fentanyl to a civilian, C.P., who died within hours. Maldonado was arrested the same day, and this investigation was initiated.

Benajmin Rivard ("Rivard") was a black flag and directed lower-ranking members. Rivard assisted Roux-Rey in distributing controlled substances to an undercover detective. Rivard also distributed fentanyl to S.F., who began overdosing within hours and subsequently died. Rivard was frequently armed during drug transactions. Law enforcement purchased or seized approximately 285 grams of methamphetamine, 242 grams of fentanyl, 2 grams of cocaine, 1,449 grams of marijuana, and 30 grams of Xanax or counterfeit Xanax from Rivard.

Branden Haven-Gault ("Haven-Gault"), an unindicted coconspirator, was also a black flag and directed lower-ranking members. Law enforcement purchased or seized approximately 88 grams of methamphetamine, 22 grams of fentanyl, and 4 grams of cocaine from Haven-Gault.

Paul Jacas ("Jacas") was a member of RMS/EBK. Jacas sold methamphetamine and fentanyl on behalf of the organization, including to an undercover detective. Jacas also sold firearms. Law enforcement purchased approximately 61 grams of fentanyl and four firearms from Jacas.

The defendant, Elena Falzone ("Falzone") was a member of RMS/EBK and sold controlled substances on behalf of the organization, including methamphetamine, fentanyl, and bromazolam, a counterfeit version of Xanax (or alprazolam). Falzone distributed fentanyl and bromazolam to an undercover detective. Falzone also distributed fentanyl and bromazolam to N.P., who died within hours of consuming the substances.

Carlos Carrasquillo-Rodriguez ("Carrasquillo") was an associate of RMS/EBK and sold controlled substances or supplied controlled substances for the gang. Carrasquillo provided controlled substances and firearms to Jacas which were subsequently sold to an undercover detective.

Zaviar Kidd ("Kidd") was an associate of RMS/EBK and was arrested in possession of controlled substances related to a random traffic stop. Kidd also sold controlled substances on behalf of RMS/EBK and would assist other members of RMS/EBK to sell controlled substances (for example, by serving as a lookout). Investigators believe Kidd was the source of two additional overdose deaths. Law enforcement purchased or seized approximately 23

grams of methamphetamine, 12 grams of fentanyl, 2 grams of bromazolam (or Xanax), 2 grams of cocaine, and 20 grams of marijuana from Kidd or controlled buys where Kidd was involved.

Olivia Marie Goen ("Goen"), distributed controlled substances to an undercover detective on three occasions. Afterwards, her home was searched, where law enforcement identified additional controlled substances. Law enforcement purchased or seized approximately 184 grams of fentanyl from Goen.

RMS/EBK Telegram Account

During the investigation, law enforcement identified a Telegram a group chat titled "Rm$ EBK." The "Rm$ EBK" Telegram group chat is a private chat that only allows admission to members who have been invited by the administrators. Within the RM$ EBK group chat, the members communicated details of narcotics and firearms sales between RMS/EBK members. Falzone was a member of the "Rm$ EBK" group chat and participated in these conversations. Falzone was also connected to other members of the RMS/EBK gang through messages and social media

accounts.

Distribution of Bromazolam and Fentanyl and Overdose Death of N.P.

During the conspiracy, Falzone distributed narcotics on behalf of RMS/EBK. She developed a relationship with a repeat customer, N.P., who purchased various types of narcotics from her on numerous occasions.

On September 15, 2023, N.P. completed two purchases with Falzone. First, he purchased "bars," from Falzone. The pills were Bromazolam, a counterfeit version of Xanax. N.P. returned later with M.I., his girlfriend and also a regular customer of Falzone, and purchased three "percs," which were actually fentanyl pills. These two purchases, which are described in greater detail below, were made using Zelle and confirmed by bank records. Geolocation from N.P.'s phone confirmed his presence near Falzone's residence and an area where she was known to traffic narcotics. After consuming the bromazolam and then later the fentanyl, N.P. overdosed and died.

The First Drug Deal on September 15, 2023

A review of N.P.'s Telegram messages from September 15, 2023, revealed a conversation beginning at 6:00 p.m. that N.P. initiated by messaging Falzone that he needed "bars" (meaning Xanax). Falzone said she would be home in 30 minutes because she was out dealing away from the

house. Falzone told N.P. to wait around the area and that she would notify him when she got home, which she did at 6:50 p.m.

Once N.P. told Falzone he was on his way to her house, Falzone asked how he would pay, and they agreed on Zelle. N.P. said he needed "5."

At 7:08 p.m., N.P. asked Falzone if she was dealing to someone else as well because he noticed a vehicle pull up behind him at his waiting spot down the street from her house. She confirmed, and a few minutes later she told N.P. that she was coming to him.




Bank records from September 15, 2023, confirm that N.P. authorized a payment to Falzone for $40.00 via Zelle at 7:13 p.m. This payment transfer was confirmed and includes the recipient's nickname, "Elena Falzone," and phone number ending in 1298 (Falzone's known phone number).

A review of the SD Card from the dash camera in N.P.'s vehicle depicts this deal occurring. N.P. waited in his vehicle for Falzone, then she got into the front passenger seat and directed him where to drive through the neighborhood to conduct the deal. During the drive, Falzone noticed the dash cam and said it was 'cool'.

Once N.P. got to a part in the neighborhood where she felt safe to conduct the deal, Falzone confirmed with N.P., "you needed five, right?" as she reached into her right pants pocket. N.P. said, "yeah, I'm sending you $40." N.P. then looked at his phone and presumably initiated the Zelle transfer. (The time stamp on the video says 18:12:52, however, the time stamp of the transfer is 19:13:09; based on this time stamp, as well as those of the text messages leading up to this deal, it seems the dash camera was approximately one hour behind.)

Falzone appeared to provide the drugs to N.P., though their hands are not within camera view, the motions are consistent with a hand-to-hand transaction. Falzone then asked him, "you try these ones?" N.P. said, "no," and Falzone said, "oh they're bussin', my boy says be careful with them, so maybe start off with a half?" N.P. responded, "you serious?" Falzone explained, "they're not like fent (meaning fentanyl) or anything, there's like a

lot of alprazolam and shit." After the deal, Falzone left the vehicle and N.P. drove out of the neighborhood.

As N.P. drove out of the neighborhood, N.P. appears to consume something consistent with a small item such as one of, or a part of, the Xanax bars he had just purchased from Falzone.

N.P. drove to Alafaya Palms trailer park, where he met up with friends. He stayed for approximately 36 minutes. Though he smoked some marijuana, his friends believed he was sober when he left.

Afterwards, N.P. and M.I. drove their own cars to get ice cream, and then to N.P.'s house. M.I. arrived in front of the house first and watched N.P. parallel park, during which he hit the curb. She made fun of N.P. and said that he should not be driving. N.P. took a moment to react but eventually said, "I do not feel that under the influence." It is hard to hear how M.I. responded, but she likely asked N.P. if he had pills/bars with him, and to share them with her, because he reached down with his right hand and retrieved what appears to be a dime bag containing pills.

M.I. placed her right hand through the window and motioned for him to give her what he retrieved from the dime baggie. N.P. handed her what appeared to be a Xanax bar, but it is unclear whether it was half or a full bar.

N.P. then explained what Falzone instructed him - to start with half a pill/bar due to the quantity of alprazolam. N.P. held another pill/bar and said he did not believe Falzone because he did not think they made Xanax to look the same way.

N.P. Second Drug Deal on September 15, 2023

Later in the night of September 15, 2023, N.P. and M.I. purchased additional drugs from Falzone. During this second drug deal, they drove to the Ranger Boulevard house in M.I.'s car, so there is no dash camera video. However, there are cellular data records, text messages, phone calls, and bank records that corroborate this deal having occurred.

At 10:38 p.m., N.P. messaged Falzone through Telegram, "yo can I slide for blues" (which investigators believe meant Percocet).

At 10:53 p.m., N.P. tried to call Falzone through Telegram, but the call was cancelled. Falzone returned the call right away, but the call was not answered. Falzone followed with the message, "[y]es."

M.I.'s phone records confirm a call occurred between her and Falzone at 10:53 p.m. that lasted for approximately 1 minute and 18 seconds.

At 11:01 p.m., N.P. messaged Falzone that they were in front of the house. Falzone responded, "[c]oming, I got the white ones."

According to bank records, at 11:03, N.P. logged into his bank account, and sent M.I. $15.00. Her bank records confirm that at around the same time she sent a payment of $30 via Zelle to Falzone. This electronic funds transfer is confirmed by Falzone's bank records.

After the deal, N.P. messaged Falzone saying, "[y]ou only gave 2." M.I. also sent a message to Falzone also saying, "yeo bro yu gave me 2" followed by a text of "wtf." A review of M.I.'s call records revealed five phone calls between her and Falzone, and two Facetime calls, in coordination with these texts being sent. The last call lasted for approximately 29 seconds.

After N.P. and M.I. completed the purchase with Falzone, they returned to N.P.'s house where they crushed and snorted the pills. A short time later they went to sleep.

At approximately 3:20 a.m. M.I. woke up to use the bathroom and noticed N.P. was unresponsive on the bedroom floor. She immediately began unsuccessfully performing CPR on N.P. before running to L.L.'s room to wake her up for help. Upon returning to the room, M.I. continued performing CPR while L.L. administered two doses of Narcan to N.P. She then called 911. After arriving on scene, Orange County Fire Rescue (OCFR) transported N.P. to Advent Health East, where he was pronounced dead at 4:33 a.m.

## Autopsy Report

Dr. Marie Hansen conducted an autopsy and determined the cause of N.P.'s death was fentanyl and bromazolam toxicity which caused fatal respiratory depression. N.P. was 19 years old at the time of death.

## CSI Crime Scene Processing

CSI processed the scene at the residence. There was loose powder, a cut red straw with residue, and an open blue grinder with white powder residue on the computer desk. The powder inside the grinder and loose powder on the desk was sent to a laboratory for forensic testing, which confirmed the presence of fentanyl.




A piece of twisted plastic grocery bag was also found on the computer desk. There was a small baggie with residue and a straw in the bedroom on the dresser. The baggie was swabbed and compared with known buccal samples from N.P. and his friend, M.I., who were both contributors to the DNA profile.

Additionally, M.I. informed law enforcement that there may be additional pills that N.P. had not consumed stored in the hilt of a knife N.P. kept in his closet. Law enforcement located two additional green rectangular pills in the hilt of the knife as described which tested positive for bromazolam. Investigators believe these were the pills Falzone advertised as "hulks" which were later also sold to an undercover agent as described below. Several days after N.P.'s death, M.I. located a baggie like the one Falzone used to provide fentanyl to an undercover agent, described below.

<u>Falzone's Telegram Channel</u>

Investigators discovered a Telegram channel named "Glizzy Glop Cop Shop" that appeared to be owned and operated by Falzone. This profile contained the name "Elena Falzone" with a last seen time of September 15, 2023, at 11:57 p.m., indicating that was the last time she was on the Telegram application. The profile card also contained Falzone's phone number, her Telegram username "@stickblickgoddess", and her biography section that touted her as, "[y]our friendly neighbor-hood pharmacist". At the bottom of the profile card was an associated link to the channel "Glizzy glop cop shop" with the description "[a]ll paid vacay to candy land! All inclusive ;)".




Further review of the Telegram channel "Glizzy Glop Cop Shop" revealed multiple posts consistent with drug sale activity. In a post on August 18, 2023, Falzone announced she had moved to the Winter Park area, near Full Sail University, but would remain available to deliver. Additional posts from September 14, 2023, advertised the sale of illicit narcotics such as psilocybin mushrooms, marijuana, THC resin, Xanax bars/pills, Percocet pills, and the pricing for each. Other posts bragged about how her customers should consider her prices a 'blessing' and shared all the ways in which she accepts payment, including electronic funds transfers.

<u>Attempted Controlled Buy Using N.P.'s Telegram</u>

On August 16, 2023, law enforcement attempted to arrange the purchase of additional narcotics from Falzone using N.P.'s Telegram account.

However, when they sent the message, Falzone did not respond but deleted their conversation and blocked him on Telegram instead.

November 3, 2023 – First Controlled Buy

On November 3, 2023, an undercover agent (UC) conducted a controlled buy with Falzone near South Ranger Boulevard and Scarlet Road. He purchased 10 fentanyl pills disguised as 30 milligram Percocet pills, and 8 bromazolam pills, disguised as Xanax, for a total of $130.

Prior to the controlled purchase, the UC contacted Falzone via her Telegram account and asked if she was "open." She said she was and asked what he needed. After some discussion, they agreed to $85 for "erks" and $40.00 for "barz." Falzone told the UC to meet her on Will O The Green Street in Orange County.

Later, the UC arrived in the area and contacted Falzone via Telegram to let her know he had arrived. Shortly after, Falzone exited the garage side entry door of *** South Ranger Boulevard. She walked to the passenger side of the UC's vehicle and got in the front seat. She immediately advised him to begin driving before giving her any money because the block was "hot." She had a small blue decorative bag that contained two baggies with pills inside. As the UC drove away from the area, she gave him the bags, one of which was orange with skull heads on it. The bag contained 10 blue pills with the

imprint "M/30" on them. The second bag was clear with 8-balls on it. The bag contained 8 green pills/bars with the marking "S903". The UC gave her $130. Falzone told him to drop her off one house north of where they met.

After completing the deal, Falzone provided the UC with her cell phone number. She exited his vehicle, walked back to her residence and entered the side entry door to the garage.

The entire exchange was audio and video recorded.



DEA forensic testing confirmed the pills contained fentanyl and bromazolam.




<u>January 2, 2024 – Second Controlled Buy</u>

On January 2, 2024, the UC conducted a controlled buy with Falzone of 20 Percocet (actually fentanyl) pills for $160 near Cady Way and Saint Dunstan Way.

The UC said he needed 20 "erks." Falzone agreed to meet at the same location on South Ranger Boulevard. Later, the UC arrived in the area and Falzone told him to meet her nearby. Moments later, Falzone sent the UC a second location and said that she was waiting in a Nissan Rogue.

The UC arrived, observed a silver Nissan Rogue, and parked behind her. She got out of the front passenger seat and got in the front passenger seat of the UC's vehicle. She handed him a clear baggie containing 20 blue pills with the markings "M/30" on them. The pills were discolored and appeared to be counterfeit. In turn, the UC gave her $160. Following the deal, she left the vehicle and re-entered the front seat of the silver Nissan Rogue.

The transaction was audio and video recorded.



The DEA lab report confirmed the pills were fentanyl.

<u>Falzone Subject Interview – January 9, 2024</u>

On January 9, 2024, an Orlando Police Department Officer encountered Falzone driving a vehicle with a temporary tag that was not registered to the vehicle and initiated a traffic stop. On approach of the vehicle, officers smelled the odor of marijuana. They subsequently searched the vehicle. In addition to fentanyl and cocaine, the OPD Officer located paraphernalia in clear small bags with black skull prints on them. These bags are consistent with the bags Falzone gave to the undercover agent during his UC buys and that M.I. provided investigators in the days following N.P.'s death.

During transport, Falzone explained that she was an aspiring musical artist and her artist name is "Pogo Glizzy". (This name is consistent with the username in the Telegram application.)

Once they arrived at OCSO, Falzone was given her *Miranda* warnings, which she acknowledged and waived. The detectives explained that they wanted to discuss an event from September 2023. They asked if N.P.'s name sounded familiar, to which she said, "no, I've never heard the name in my life." Detectives asked Falzone the same question about M.I.'s name; she repeated the name to herself twice, and then denied knowing M.I.

Falzone confirmed that her cell phone number is the number ending in 1298, that her musical artist name is "Pogo Glizzy", and that she has various social media accounts including Instagram and Telegram. Falzone acknowledged that her most common name on social media accounts is some variation of either "Pogo" or "Pogo Glizzy".

Detectives showed Falzone a picture of her Telegram profile taken on September 16, 2023. Falzone stared at the picture in silence for a few moments and then said, "yeah, that's my profile." Detectives read the information within the photograph including her name, the last seen time, and her phone number. Despite having just acknowledged this profile as being hers, Falzone said, "but I don't think I used Telegram at that time." Detectives continued to read the information from the profile, specifically the username "@stickblickgoddess" to which Falzone claimed it was not her username at

that time, despite having just claimed she did not think she used Telegram at that time. Falzone said, "I just made it my username, like recently."

Falzone eventually admitted that she sells "some" drugs, and specified that she deals marijuana, cocaine, and Xanax, but mainly marijuana. Eventually, Falzone specified that the last time she dealt drugs was possibly October 2023. This was another lie because undercover agents had purchased from Falzone in November 2023, and January 2024, as described above.

Detectives reviewed the Telegram channel content with Falzone, during which she identified "hulks" as a type of Xanax that are rectangular and typically have a green color to them. Falzone identified "30s" as Percocet's, "blues," or "Perk 30's." Falzone was shown a photograph from her Telegram channel on September 16, 2023, and she claimed that the pills advertised were Percocet's. Falzone said she sold them for about $30 per pill or $1 per milligram. When asked how she received payment, Falzone stated, "[u[]sually just cash." She identified "Ghost" as Benjamin Rivard and her supplier.

Detectives brought the conversation back to N.P. and again asked Falzone if she remembered him. Falzone said his first name now sounded familiar, but not the last name. Eventually, Falzone admitted she knew both N.P. and M.I. Falzone stated the last time she spoke to N.P. was a few months ago, but could not provide a timeframe, and specified that N.P. just

stopped contacting her. Detectives asked her when the last time she saw him and why. Falzone paused before saying, "Ghost wanted me to give him some Xans (Xanax)."

Falzone articulated that this deal was at nighttime and recalled having met with both M.I. and N.P. that day. Falzone specified that M.I. wanted "thirties" (Percocet's), and that she saw N.P. first, and M.I. second, but she could not remember how they paid her. Detectives showed her N.P.'s Chase bank account records and specifically reviewed Zelle transfers from N.P. to Falzone. Afterwards, Falzone answered, "I think so," when asked if she remembered whether N.P. paid her through Zelle.

Falzone was confronted with outgoing call logs made from N.P. to Falzone, confirmed that Falzone has used the application called Textnow, and reviewed messages in Textnow between Falzone and N.P. After, Falzone finally admitted that she knew N.P. and claimed that she would deal Percocet's and Xanax bars to N.P., but added, "but never at the same time" implying she would not sell Xanax and Percocet's to the same customer at the same time. This was not accurate as Falzone sold both to N.P. and also to the UC in one transaction, as described above. Falzone confirmed Zelle payments from N.P. and M.I. were accurate.

While reviewing messages from September 15, 2023, Falzone initially claimed she only sold N.P. and M.I. Xanax bars, because she did not have Percocet's in stock, despite messages on Falzone's Telegram channel clearly advertising Percocet's on that day. Conversation went on with Falzone continuing to lie and be confronted with evidence contradicting her lies.

Detectives then reviewed the details of the drug deal between Falzone and N.P. that occurred earlier in the evening of September 15, 2023, during which Falzone acknowledged that she sold two or three "hulks" to N.P. that day, despite N.P. having clearly ordered five. Falzone recalled that the bars would be a dark green color, which is consistent with the bars found in the knife hilt in N.P.'s room following his death, which tested positive for bromazolam. Detectives then reviewed the details of the second drug deal that occurred later in the night of September 15, 2023, involving Falzone, N.P., and M.I. As detectives read the messages in which N.P. asked for "blues," Falzone argued that N.P. was not asking for Percocet's but was asking for more Xanax, still purposefully insisting that she did not sell Percocet's with Xanax.

Detectives confirmed that Falzone knew Jacas, whom Falzone stated is like a brother to her. Detectives explained to Falzone that law enforcement had talked with Jacas, and that he told them Falzone called him crying about

N.P.'s death. Falzone claimed she was simply upset over the fact that N.P., "a good friend" of hers had died. When asked what else she told him, Falzone responded, "that I feel like I might have been involved in his death." When asked why she would feel that way, she answered, "because I had given him his Xans the day before."

Falzone continued to emphasize that she only sold N.P. Xanax that day. Falzone elaborated, "[f]rom the best of my recollection, I didn't give him any perks that day because I don't like to sell people Xanax and perks together because I've OD'd (overdosed) off that personally myself." She said, "the mix with the Xans and the Percs are toxic."

Falzone said one of her customers told her, in either July or August of 2023, that they tested the Xanax she sold them and it contained bromazolam, not Alprazolam. Falzone said that after being told this, she looked it up herself and based off what she read believes bromazolam is just a stronger form of Alprazolam.

When asked whether the "hulks" she sold N.P. that night contained bromazolam, Falzone nodded. And when asked if the "percs" that she sold N.P. and M.I. that night contained fentanyl she nodded again.

Falzone then explained that she found out about N.P.'s death the next morning and she "freaked out" and remained home that day. She further said

she might have deleted the Telegram messages she exchanged with N.P. Detectives asked Falzone if deleting those messages would have been one of her priorities, to which she responded, "someone from that account hit me up. I knew he was dead, so I was very confused." Falzone claimed, "there was no ill intent behind it." When asked to explain herself she responded, "I just didn't know what to do. I was freaking out. I have anxiety, like what am I going to do, talk to a ghost?" Detectives explained that she tampered with evidence and asked, "[s]o you willingly, purposefully with the intent of saving your own [expletive], deleted conversations between you and N.P. and then blocked his account, correct?" She responded, "yes."

The above is merely a summary of some of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all the events, persons involved, or other information relating to this case.