UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 6:25-cr-321-PGB-CAB

ELENA JOSEPHINE FALZONE
a/k/a "Pogo"
a/k/a "Pogo Glizzy"

**UNITED STATES' SENTENCING MEMORANDUM**

Because of the deliberate actions of the Defendant, Elena Josephine Falzone, N.P. is gone. He was 19 years old. He loved birds and video games. He was kind and generous and fiercely loved. He can never be replaced. And he will never come back. No length of time can change that. But this Court's sentence can dispose justice to the defendant and to those who care for N.P.

The Presentence Investigation Report (PSR) calculates the Defendant's guidelines range at 720 months or 60 years.[1] PSR ¶ 227. The United States recommends that the Court sentence the Defendant to no less than 25 years of imprisonment.[2] This sentence is warranted given (1) the nature and

[1] The Defendant scored at Offense Level 43, Criminal History Category I, with a guidelines range of life. However, because a life sentence is not an authorized punishment for either count, the guidelines range becomes the maximum penalty.
[2] There are unresolved objections to the guidelines calculations. The United States believes this recommendation is just and appropriate regardless of the resolution of those issues. This recommendation is effectively a low-end sentence after a 3-level downward variance from the guidelines as calculated by the Final PSR.

circumstances of the instant offense; (2) the impact of the Defendant's crimes on the victim's family and those who love him; (3) the Defendant's history and characteristics; (4) the need to avoid unwarranted sentencing disparity; and (5) the need for the sentence imposed to provide just punishment, adequate deterrence, respect for the law, and protection of the public. *See* 18 U.S.C. § 3553(a).

**I. The Nature and Circumstances of the Offense**

The nature and circumstances of the offenses committed by the Defendant, which is set forth in the PSR, weigh in favor of the 25-year sentence recommended by the United States. *See* 18 U.S.C. § 3553(a)(1). The Defendant was dealing large quantities of fentanyl, a deadly substance. This was not a one-time offense. The Defendant was dealing drugs over the course of months as a part of the larger criminal gang whose principal source of income was the sale of illegal drugs.

While selling these dangerous drugs, the Defendant marketed her product on social media to reach the maximum number of people. PSR ¶ 111. In her posts she advertised the items she had for sale, including psilocybin mushrooms, marijuana, THC resin, Xanax bars/pills, Percocet pills, and the prices for each. *Id*. She referred to herself as "your friendly neighborhood

pharmacist" and bragged about her pricing, referring to it as a "blessing" for her customers. *Id*.

And, not surprisingly, she sold drugs that killed someone. On September 15, 2023, she sold N.P. bromazolam, disguised as Xanax, in the afternoon, and fentanyl, disguised as Percocet, in the evening. His consumption of those pills caused his death.[3]

This Defendant knew the likelihood of death well in advance of September 15, 2023. For starters, she knew the blue "M30" pills contained fentanyl. PSR ¶ 142. The potentially fatal risks of taking fentanyl are widely known; as the Defendant points out in her sentencing memo, there is an ongoing epidemic of fatal overdoses in the United States. Further, a high-ranking RMS/EBK member had been arrested for causing a fatal overdose in December of 2022. Yet, the organization continued to sell fentanyl disguised as Oxycodone/Percocet for another nine months before N.P.'s death, and for months after that.

The Defendant also knew the danger of the pills she was selling because she had overdosed on them herself, in particular, the combination of bromazolam and fentanyl. PSR ¶¶ 136 and 140. This combination is

[3] At the time of the offense, bromazolam was not a controlled substance. It has since been added to the schedule of controlled substances. The government was determining how to charge the death with the combination of substances when the Defendant offered to plead guilty and stipulate to the death resulting.

dramatically more dangerous than taking fentanyl alone; both drugs slow the central nervous system and bromazolam is resistant to medications like Narcan which can reverse the effects of fentanyl. As the Defendant said in her interview with law enforcement, "the mix with the Xans and the Percs are toxic." PSR ¶ 142.

The Defendant found out about N.P.'s death the next morning. PSR ¶ 143. When law enforcement attempted to contact her from N.P.'s phone, she blocked his number and deleted their messages. PSR ¶ 143. She admitted that she did this hoping to delete the evidence linking her to N.P.'s death. *Id*. She even admitted that she contacted one of her co-defendants, Paul Jacas, distraught after N.P.'s death. PSR ¶ 139. She knew she was responsible for N.P.'s death. *Id*.

But even N.P.'s death did not stop the Defendant. Knowing full well that the pills she was selling had killed someone, she continued to sell them for another four months. No remorse, no attempts to seek help with any mental health or substance use issues she might have, no attempt to distance herself from RMS/EBK. She continued. And for this reason, the Defendant deserves little leniency from this Court.

And when she was arrested and interviewed by law enforcement on January 9, 2024, she lied about her involvement with N.P. PSR ¶¶ 129-143.

She denied knowing N.P. or his girlfriend despite them being regular customers. *Id*. She minimized the extent of her drug trafficking activity. *Id*. She blamed co-defendant Benjamin Rivard, even though he was in jail at the time. *Id*. She denied ever selling "Xanax" and "Percocet" at the same time even though she had sold them both to N.P. as well as the undercover agent. *Id*. After being repeatedly confronted with evidence disproving her lies, she finally came clean.

The Defendant's criminal conduct is about as serious as it gets. While the Defendant did not intentionally kill N.P., what she did is not dramatically different. She sold him drugs with a very clear understanding of the likelihood of death. She displayed a callous disregard for the sanctity of human life when she misrepresented fentanyl to her customers over and over again.

## II. Victim Impact

The Defendant sold N.P. fentanyl when he believed it to be Percocet and he lost his life.

It is impossible to put into words the impact of the Defendant's crimes on his family and friends. The Court has read the powerful statements of his family and friends. The statements were honest, and raw, and deeply sad. N.P. was loved by all. So many lives are devastated by his loss. If this factor were to be assessed in a vacuum, it would call for the highest punishment

possible under the law. A sentence of at least 25 years will provide some sense of justice to N.P.'s family. They will know that while their loved one is lost, the Defendant will not be out walking freely and enjoying her life for at least that long. Anything less will trivialize their loss and the Defendant's role in it.

## III. The History and Characteristics of the Defendant

Defendant's history and characteristics also weigh in favor of the proposed sentence. 18 U.S.C. § 3553(a)(1). As the probation officer noted in the PSR ¶ 244, the Defendant's criminal history is underrepresented. She has no criminal convictions despite being arrested 11 times. PSR ¶¶ 182-192.

On February 26, 2020, law enforcement arrived at the Defendant's home in response to a Baker Act ordered by the Defendant's therapist. PSR ¶ 183. She physically resisted, attempting to bite one officer on the hand and kicking another in the face. *Id*. During the course of her resistance she removed a magazine from the officer's duty belt. *Id*. These charges were not pursued.

Two days later, at the University Behavioral Center, she stole a nurse's phone and struck her in the face. PSR ¶ 184. Charges were not pursued.

On May 14, 2020, she was found in possession of marijuana during a traffic stop. Charges were not pursued. PSR ¶ 185.

On June 14, 2021, the Defendant was arrested after she assaulted her roommates with a knife. Charges were not pursued. PSR ¶ 186.

On February 9, 2022, the Defendant was arrested after she struck her ex-girlfriend in the face and hit her in the head with a baseball bat. The argument was over marijuana. PSR ¶ 187. Charges were not pursued.

The following day when she was released from custody, the Defendant broke into her parents' home and got into an argument with her mother, again over marijuana. During the argument, the Defendant hit her mother multiple times in the head. Her parents then called the police. PSR ¶ 188. Again, charges were not pursued.

On January 9, 2024, she was arrested with fentanyl and cocaine during a traffic stop. Those charges were merged with the prior state case. PSR ¶ 189.

The Defendant has presented a psychological evaluation as mitigation for her arrest history and the charged offense. The Defendant has been diagnosed with some serious mental health conditions that are indeed difficult to manage. This is certainly mitigating and a large reason why the United States has made a downward variance recommendation. However, the extent of the mitigation should be placed in context. The Defendant's mental health decline began in high school reportedly after a bad break-up. The government does not trivialize the Defendant's anguish – everyone can understand the

pain of a broken heart. But that is precisely the point, almost everyone has been there at one point or another. Broken hearts in high school are almost a rite of passage. Most people gradually mend their hearts and move on and do not turn to a life of crime. The Defendant otherwise grew up in a privileged home with a loving family. She was a good student and a talented athlete. She had more going for her than most defendants in her situation.

Her mental health concerns clearly played a role in her start down the wrong path. But throughout the years, she received leniency from law enforcement, treatment in mental health and rehabilitation facilities, and access to tools to help her turn her life around and start down a better path. She had the ability to take steps to manage her mental health condition, but the record reflects that she did not take those steps or use those tools. Instead, she turned to drugs. This was a deliberate choice that she made repeatedly. Many people with mental health concerns manage them every day and do not turn to crime. While this is a matter in mitigation, it is not an excuse. The government's recommendation places this part of the Defendant's history in the proper context.

## IV. Need to Avoid Unwarranted Sentencing Disparity

Co-defendants Benajamin Rivard and Jeremiah Maldonado are also pending sentencing for distributing fentanyl resulting in death. The mandatory

minimum sentence they face is 20 years. If this Defendant receives a sentence below 20 years it will amount to an unwarranted sentencing disparity.[4] 20 years is the minimum for this offense. And this offense is made worse because it was not an isolated crime but rather one sale amongst hundreds. This offense is worse because the Defendant misrepresented the true nature of the substance she was dealing, obscuring the fatal risk from her customers. This offense is worse because it was part of a larger conspiracy that killed others. This offense is worse because after N.P.'s death, she did not stop. This offense is worse because of the devastating impact N.P.'s death had on so many people.

**V. Just Punishment, Adequate Deterrence, Respect for the Law, and Protection of the Public**

A 25-year sentence is also necessary to meet the sentencing goals of adequate deterrence, respect for the law, protection of the public and just punishment in this case. So far, nothing has worked to get the Defendant on the right path. She has clearly benefitted from her time in confinement. She will also benefit from mandated treatment during her term of supervision.

Significantly, she needs to be dissuaded from ever committing another

[4] The United States anticipates arguing for a higher sentence for both Rivard and Maldonado due to the specifics of their conduct and history and characteristics. However, Defendant Falzone should not get a sentence that is lower than their mandatory minimum for the same offense.

drug trafficking crime again. On a broader level, the sentences in this case can help to send a deterrent message to those in our community who might continue dispensing poison onto the streets: deal in fentanyl and you will suffer the consequences.

## Conclusion

The government's recommendation comes after significant consideration. On the one hand, this is a criminal offense that resulted in death. It does not get much more serious than that. The effects of this crime have devastated the lives of so many, and severe consequences should flow from that. On the other hand, there is a young defendant who pleaded guilty and saved the government - and more importantly N.P.'s family - from the efforts of a trial. She should receive some benefit for that.

The United States thus recommends that this Court sentence the Defendant to no less than 25 years of imprisonment.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

*/s/ Rachel S. Acosta*

By: RACHEL S. ACOSTA
Assistant United States Attorney
USA No. 215
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: Rachel.Lyons@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Mark Reyes, Esq.
*Attorney for Defendant*

*/s/ Rachel S. Acosta* __
RACHEL S. ACOSTA
Assistant United States Attorney
USA No. 215
400 W. Washington Street, Suite 3100
Orlando, Florida 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: Rachel.Lyons@usdoj.gov